# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
### SOUTHERN DIVISION

| | |
|---|---|
| **KRIS CRUTCHER, et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Case No. 6:15-CV-03484-MDH** |
| ) | |
| **MULTIPLAN, INC., et al.,** ) | |
| ) | |
| **Defendants.** ) | |

## ORDER

Before the Court are Defendants Multiplan, Inc. and Private Healthcare Systems, Inc.'s Motions for Summary Judgment. (Docs. 294 and 370) and Plaintiffs Kris Crutcher and Tri-Lake Diagnostic Imaging, LLC's Motions for Summary Judgment. (Docs. 300 and 379). Plaintiffs have sued Defendants for violations of the Racketeer Influenced and Corrupt Organization Act ("RICO"), Unjust Enrichment, Civil Conspiracy, Common Law Fraud, and Breach of Contract.[1] (Doc. 33). Plaintiffs, who provide diagnostic medical imaging services to patients, allege that Defendants, who operate a preferred provider organization ("PPO"), engaged in a "Silent PPO" scheme to deprive them of substantial revenues to which Plaintiffs were entitled. Defendants in their Motions ask the Court to hold that (1) Plaintiffs cannot establish the essential elements of its RICO claims; (2) Plaintiffs' unjust enrichment claim fails as a matter of law and for lack of evidence; (3) Plaintiffs' civil conspiracy claim fails a matter of law; (4) Plaintiffs cannot establish a claim of fraud; and (5) Plaintiffs' breach of contract claim fails as a matter of law. Plaintiffs, in their Motions for Summary Judgment, ask for judgment on their six claims. For the reasons

---

[1] Plaintiffs have submitted that Count VI of its Amended Complaint, a claim for Accounting and Disgorgement, is no longer necessary and is withdrawn. (Doc. 315 at 24, n. 47).

1

explained below, the Court will grant Defendants' Motion as to Plaintiffs' RICO claims, unjust enrichment claim, civil conspiracy claim, and fraud claim, but deny it in part as to Plaintiffs' breach of contract claims. The Court will grant Plaintiffs' Motion for Summary Judgment as to its breach of contract claim in part but deny the balance of their motions.

## Background

Plaintiff Tri-Lakes Diagnostic Imaging ("TLDI"), a company owned by Plaintiff Kris Crutcher, provides diagnostic imaging services to patients in Branson, Missouri. Defendants operate a PPO, which is an intermediary between health care providers and payors, including health insurance companies, that pay providers on behalf of their clients. When an insured patient uses TLDI's services, it is the insurance company, not the patient, who pays TLDI, excluding any co-payment or deductible borne by the patient. PPOs create relationships between payors, like insurance companies, and providers whereby the payors steer patients to providers in the PPO network. In exchange for the increase in business as a result of being in-network, the provider agrees to charge the payors a discounted rate. In theory, providers benefit despite receiving lower payments because they receive an increased volume of customers. Payors, meanwhile benefit from being able to pay at a discounted rate. The role of the PPO operator is to create and maintain these networks, determine which patients are in and out of network, and to notify payors of available discounts they can apply to payments to in-network providers so that payors may pay the provider the discounted rate.

In this case, Plaintiffs allege that no PPO agreement existed between them and Defendants. Plaintiffs also allege that Defendants were involved in a silent PPO scheme. A silent PPO scheme is an illicit payment scheme whereby the payor rents out their negotiated PPO discount to other payors who are not entitled to that discount. As a result, providers are paid at discounted rates,

instead of their usual rates, by payors who are not party to the PPO agreement.[2] Because the third-party payors are not obligated to steer its customers to the provider but nonetheless pay the discounted rate, the provider receives none of the benefits of the PPO agreement and bears all of its costs. Plaintiffs allege they lost significant revenue as a result of Defendants' scheme.

### a. Corporate History

Medical Investments of Branson, LLC, was organized as an LLC in Missouri in 1999 with a business address at 523 State Hwy. 248, Suite 300, Branson, Missouri 65616. That same year, it registered the fictitious name "Branson Imaging, LLC." On April 1, 2000, the company entered in a Provider Agreement contract with a PPO, United Payors and United Providers ("UP&UP"). Under that contract, the Provider Agreement would be renewed automatically every year unless either party gave written notice of its intention to terminate the agreement at least ninety days prior to the expiration of the current one-year term. The contract stated that UP&UP was contracting for itself and for the benefit of any affiliates having common management and control with UP&UP, including any subsequently-acquired affiliate. Later, UP&UP was acquired by BCE Emergis

---

[2] A paradigmatic silent PPO scheme is described in *Roche v. Travelers Prop. Cas. Ins. Co.*, 2008 WL 2875250 at *1 (S.D. Ill. 2008) as such:

> "Essentially, a silent PPO occurs when a payor receives a PPO discount to which he is not entitled. For example, suppose a patient with an indemnity insurance plan goes to a provider who is part of a PPO. By definition, the patient with an indemnity insurance plan is not steered towards a provider, but is free to choose any provider he wishes. The patient typically pays a percentage of the total bill and his insurance pays the rest. In a silent PPO, after the patient pays his share of the bill and the provider submits the outstanding balance to the payor for payment, the payor notices that the provider is a member of a PPO. The payor then proceeds to pay the provider at the PPO discounted rate instead of the usual and customary rate. If the payor and provider are both members of the PPO, this discount payment may constitute a breach of the PPO contract. If the payor is not a member of the PPO, but pays only the PPO rate, this discount payment may constitute fraud."

Corp., which was in turn acquired by Multiplan in 2004. Multiplan also acquired Private Healthcare Systems, Inc. ("PHCS") in 2006.[3]

On October 2, 2000, Articles of Organization were filed creating Branson Imaging, LLC. It was organized by the same person at the same business address as Medical Investments of Branson. Its registered agent and managing partner was Robert Heriford. On April 2, 2001, Medical Investments of Branson, LLC, cancelled the fictitious name of "Branson Imaging." Medical Investments of Branson did not file Articles of Termination until April 17, 2013.

On January 10, 2003, Articles of Incorporation were filed creating Tri-Lakes Diagnostic Technologies, Inc. ("TLDT"). Its business address was identical to Branson Imaging's address. On February 8, 2003, Robert Heriford, in his capacity as Branson Imaging, LLC's managing partner and registered agent, wrote to Blue Cross Blue Shield:

> Effective February 6, 2003, Branson Imaging, LLC is now operating under the new name of Tri-Lakes Diagnostic Technologies, Inc. Everything remains the same as before. Attached is a W-9 for your convenience.
>
> Branson Imaging, LLC – Tax ID number of 43-1904174 is now Tri-Lake Diagnostic Technologies, Inc. Tax ID number of 42-1570105."
>
> Please note this change.

Soon after, Multiplan changed the provider name and tax identification number ("TIN") associated with the Network Agreement to reflect Heriford's requested changes. An employee of Multiplan who manages Network Agreements, Nina Conway, testified at deposition that such a change would not have been made absent a specific request from the provider. TLDT was administratively dissolved on November 10, 2008.

---

[3] Because PHCS is a wholly-owned subsidiary of Multiplan, the Court will, when convenient refer to the defendants collectively as "Multiplan" in this Order.

4

On February 5, 2008, Articles of Organization were filed creating Tri-Lakes Diagnostic Imaging ("TLDI") with Kris Crutcher as the registered agent and sole organizer. Its business address was identical to Branson Imaging's address. On February 22, 2008, Crutcher wrote to Multiplan that TDLI was a freestanding imaging facility that had a previous contract with Multiplan through a radiologist who was no longer affiliated with the facility and that the facility's ownership and name had "changed slightly."

On May 5, 2008, Crutcher sent a message to Multiplan, stating:

> We have changed our name and EIN. The former name for our company was Branson Imaging. The address remains the same as well as the services and imaging capabilities we offer. Please make the following changes to update your system . . .

> The billing address is the same as the business address above. We look forward to continuing to provide imaging services for our clients. Thank you for your time and attention.

On June 9, 2008, Crutcher sent a similar message to Multiplan, where she again asked to substitute the new name and TIN (Tri-Lakes Diagnostic Imaging, LLC, 51-0667791) for the old name and TIN (Branson Imaging, 43-1904174) in their directory. She also said that she "look[ed] forward to continued patient service for your clients" and that the "address remains the same as well as the services we provide." Crutcher stated she wrote the letter after noticing that Multiplan's PPO directory listed Branson Imaging, not TLDI, as an in-network provider. Nina Conway stated that she understood Crutcher's correspondence to mean that she was assuming ownership of the business at that address and meant to continue the Network Agreement that had been in effect since April 1, 2000, on behalf of TLDI.

Conway testified at deposition that following the June 9, 2008 letter, Crutcher contacted Multiplan on numerous occasions to complain that TLDI had not been substituted for Branson Imaging in the PPO system and was not being treated as in-network. Conway also testified that Crutcher appealed a number of claims because payors were not being given "in-network" discounts

5

by Multiplan after directing patients to TLDI. Multiplan updated its provider name and TIN as requested by Crutcher.

Multiplan claims the Provider Agreement between UP&UP and Branson Imaging survived these acquisitions and transfers, eventually becoming an agreement between Multiplan and TLDI. Plaintiffs admit that Multiplan acted as if a Provider Agreement existed between itself and TLDI but deny that any agreement actually existed. There is no evidence that Medical Investments of Branson, Branson Imaging, TLDT, or TLDI ever provided written notice of its intent to terminate the Provider Agreement before 2014.

**B. Post-2008 Communications between Multiplan/PHCS and TLDI**

Plaintiffs claim that although they were aware of the Provider Agreement from the beginning because her payments from insurance companies were routinely subject to Multiplan discount, they never thought TLDI was actually part of the PPO network. On June 19, 2008, Crutcher faxed a letter to Multiplan stating that she was interested in joining Multiplan's network. She says Multiplan never responded. Because of its nonresponse, Crutcher on July 20 and 22, 2009, requested from Multiplan a copy of the Provider Agreement it had on file for TLDI. Multiplan responded two days later that it was having trouble locating the agreement, but that Multiplan had become part of the Provider Agreement entered into by UP&UP by virtue of its integration with BCE in 2004 and BCE's subsequent acquisition by Multiplan. Multiplan also stated that PHCS had been added to the agreement by virtue of its acquisition by Multiplan in 2006. On July 29, 2009, Multiplan located the Provider Agreement and sent it to Crutcher.

Five years later, beginning in 2014 and extending into 2015, Plaintiffs, in response to receiving Explanation of Benefits ("EOBs") from payors that showed Multiplan discounts being applied to their invoices, sent multiple letters to payors and Multiplan disputing the notion it had

6

a contract with Multiplan, protesting the discounts, and requesting they stop being applied. Neither Multiplan nor the payors responded to these letters, and the discounts continued unabated. In February 2015, Crutcher sent a more formal letter to Multiplan requesting a copy of the current fee schedule Multiplan had been applying to TLDI payments and asking that a new provider agreement be created between the parties. On August 13, 2015, Crutcher again sent a letter to Multiplan claiming there was no contractual agreement between TLDI and Multiplan, asking for a full accounting of and reimbursement for discounts given to TLDI customers and directing Multiplan to cease any future discounting for customers using the Multiplan network.

In response, Multiplan sent a letter to TLDI on September 14, 2015, explaining that because of Crutcher's June 9, 2008 letter, it had substituted TLDI for Branson Imaging, LLC, in the Provider Agreement. It noted that because it had not received written notice of its intention to terminate, as referenced in the Provider Agreement, it had continued to include TLDI in its network and apply discounts. Not long after, Multiplan informed Plaintiffs it was unenrolling TLDI from its network, effective September 8, 2015. On November 6, 2015, Plaintiffs filed this action. Plaintiffs allege that despite Multiplan's representation in its September 14, 2015 letter, it continued to apply discounts to TLDI customers using the Multiplan network until May 18, 2016.

### C. Provider Agreement

There are two types of contracts that, in combination, create Multiplan's PPO network. The first type is comprised of the provider agreements entered into between Multiplan and medical providers, such as TLDI. The second type includes the network agreements entered into between Multiplan and payors, including in this instance entities like Coventry, Procura, and Cox HealthPlans. Network agreements require payors to steer patients to in-network providers by providing financial incentives, but also allow those payors to access the discount rate when paying

those providers. The provider agreements allow for medical providers to be listed in Multiplan's Provider Directory and to benefit from the increased volume of patients steered to their businesses, but at the cost of only being compensated at the discounted rate. Plaintiffs allege that Multiplan allowed payors who did not have network agreements with Multiplan to apply its discount rate when TLDI sent them bills without providing steerage, depriving TLDI both the opportunity to serve more patients or bill its full rate. Multiplan claims every payor given access to the discount rate was a part of its network and entitled to access the discount rate.

Branson Imaging, Inc. entered into a Provider Agreement with UP&UP whereby it agreed to participate in UP&UP's PPO Network. Under the Provider Agreement, Branson Imaging agreed to offer discounted rates to payors in Multiplan's network. A "payor" is defined as

> any self-insured employer, provider organization, health maintenance organization, financial institutions and associations, such as VISA and MASTERCARD, insurance company, third party· administrator, or any other entity and/or the clients of any of these entities which is responsible under Health Care Plan Benefits, liability claims, or Worker's Compensation benefits to pay Services for a Covered Person *and has an active Payor Agreement with UP&UP*.

(emphasis added). A network agreement—referred to as a "Payor Agreement" in the above text—is defined as "an agreement between Payor and UP&UP providing access to UP&UP's Provider Network for Covered Person. Further, in the Provider Agreement, UP&UP agreed "not to offer discounted services to any Payor who sells or leases UP&UP's list of contracted Providers, either directly to other Payors or to a broker, who then sells the list to other Payors."

Under the Provider Agreement, the settlement to TLDI for outpatient services for patients referred to TLDI by UP&UP was set to be "75% of Charges for Services rendered", equivalent to a 25% discount. The contract provides "All amendments or modifications to this Agreement shall be mutually agreed to in writing by Provider and UP&UP."

**D. Network Agreement and Rental of Network by Third Parties**

Plaintiffs claim that Multiplan entered into several network agreements that allowed downstream payors with no contractual linkage to Multiplan to apply the discount rate in violation of the Provider Agreement. One of these network agreements was between Multiplan and Coventry, Inc. For the purposes of providing background, the Court considers the network agreement between Multiplan and Coventry to be substantively similar to its other network agreements. TLDI was not a party to any network agreement.

Coventry had certain clients defined under the Network Agreement as "under contract with Coventry. These included the state of Illinois, the City of Chicago, Texas Mutual Insurance, 7-Eleven, Southwest Airlines, Sears, and Liberty Mutual. These entities, known as "downstream entities" were authorized to access Multiplan's discount through Coventry under the Network Agreement between Coventry and Multiplan. Under § 4.1.8.5 of the Network Agreement, Coventry and its clients were obligated to "employ channeling and other network steerage and direction techniques that require and allow Participants to utilize Medical Providers for Health Services." This language obligated Coventry and similar downstream entities to steer its patients toward TLDI. It should be noted that the Network Agreements entered into between Multiplan and payors like Coventry did encourage and provide for steerage of patients to Plaintiffs, even when those patients were being referred from downstream entities. While it not clear from the record how much, if any, success these payors had in steering patients to TLDI, Multiplan did recognize that TLDI expected to benefit from these agreements at the cost of being paid a discounted rate. These downstream entities did not have active payor agreements with Multiplan or its predecessors.

**Standard of Review**

Summary judgment is proper where, viewing the evidence in the light most favorable to

9

the non-moving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Reich v. ConAgra, Inc.*, 987 F.2d 1357, 1359 (8th Cir. 1993). "Where there is no dispute of material fact and reasonable fact finders could not find in favor of the nonmoving party, summary judgment is appropriate." *Quinn v. St. Louis County*, 653 F.3d 745, 750 (8th Cir. 2011). Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant meets the initial step, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To satisfy this burden, the nonmoving party must "do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

A question of material fact is not required to be resolved conclusively in favor of the party asserting its existence. Rather, all that is required is sufficient evidence supporting the factual dispute that would require a jury to resolve the differing versions of truth at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248-249. Further, determinations of credibility and the weight to give evidence are the functions of the jury, not the judge. *Wierman v. Casey's General Stores, et al.,* 638 F.3d 984, 993 (8th Cir. 2011).

## Discussion

### A. Existence of Provider Agreement between TLDI and Multiplan

Multiplan asserts there is no genuine issue of material fact as to whether TLDI and Multiplan had a valid Provider Agreement. The corporate history of TLDI and Multiplan is

complex, but for the purposes of this discussion it is enough to say that in April 2000, Medical Investments of Branson d/b/a Branson Imaging entered into a provider agreement with UP&UP. Through a series of acquisitions and mergers, UP&UP in 2006 became part of the Multiplan/PHCS network. The Provider Agreement by its own terms survived these acquisitions. At each step, the new PPO was simply substituted for the old PPO in the contract.

On the provider side of the original contract was Medical Investments of Branson d/b/a Branson Imaging. At some point, Branson Imaging, LLC, was substituted for Medical Investments of Branson d/b/a Branson Imaging in the provider agreement. Soon after, Articles of Incorporation were filed creating Tri-Lake Diagnostic Technologies, Inc. In January 2003, and at the request of Branson Imaging, TLDT was substituted for Branson Imaging as the provider in the Provider Agreement. Five years later, in February 2008, Crutcher filed Articles of Organization for Tri-Lake Diagnostic Imaging, LLC. Later that month, and again in May 2008, Crutcher sent correspondence to Multiplan asking to substitute TLDI for Branson Imaging as the provider in the Provider Agreement. Multiplan granted Crutcher's request, substituting TLDI for Branson Imaging in the Provider Agreement and listing TLDI in its PPO network. Five years later, Plaintiffs began to dispute the discounts being applied under the Provider Agreement.

The first question before the Court is whether Crutcher's letters to Multiplan accomplished the goal of substituting TLDI for Branson Imaging as the provider in the Provider Agreement. TLDI argues that because there was never any meeting of the minds between Plaintiffs and Defendants, there was no valid contractual relationship. In Missouri, "mutuality of agreement" is an essential element in a contract. *Bldg. Erection Serv. Co. v. Plastic Sales & Mfg. Co., Inc.*, 163 S.W.3d 472, 477 (Mo. Ct. App. 2005). This requires a "meeting of the minds" of the contracting parties regarding the same thing, at the same time. *Walker v. Rogers*, 182 S.W.3d 761, 768-69

(Mo. Ct. App. 2006). The Court will determine whether there was a meeting of the minds by looking to the intention of the parties as manifested in their words and acts. *J.H. Brown*, 331 S.W.3d 692, 702 (Mo. Ct. App. 2011).

After careful review of the evidence, the Court finds that there was a mutuality of agreement between TLDI and Multiplan. The Court's finding is informed by the letters Crutcher sent to Multiplan in May and June asking for TLDI to be substituted for Branson Imaging in its provider directory. These letters clearly evince Crutcher's desire to keep her diagnostic imaging business in the Provider Agreement. Although Multiplan did not respond affirmatively to Crutcher's correspondence, it did make the desired change in its system as reflected in its provider directory. This act clearly evinces acceptance of Plaintiffs' offer to be substituted for Branson Imaging, subject to the identical terms and conditions of the contract. At that point, a meeting of the minds occurred, and a contract between TLDI and Multiplan came into effect.

TLDI draws attention to the fact that it apparently had no copy of the Provider Agreement when it asked Multiplan to substitute itself for Branson Imaging. Under Missouri law, a meeting of the minds requires that "the nature and extent of the contract's essential terms must be certain or capable of being certain." *Smith v. Hammons*, 63 S.W.3d 320, 325 (Mo. Ct. App. 2002) (internal quotations omitted). TLDI argues that because Plaintiffs did not have a copy of the Provider Agreement until after Multiplan had added it to its network, no meeting of the minds could have occurred. This argument is unavailing. First, although Crutcher did not have a copy of the Provider Agreement when she requested TLDI be substituted for Branson Imaging, she was certainly aware of the essential terms inherent in any PPO agreement because of her experience with TLDT and Branson Imaging, who were members of the same PPO network. If she were not aware of the nature of the agreement, she would presumably not have asked to be party to it. Second, even if

the essential terms of the contract were unknown to her, the holding of *Smith v. Hammons infra* does not by its plain language require them to be known. Rather, it requires them to be "certain or capable of being certain." *Id.* In this case, the terms were certain in the sense that they were embodied in the Provider Agreement, and capable of being certain in the sense that Plaintiffs could have procured a copy of the Provider Agreement at her convenience. In July 2009, Plaintiffs did in fact ask for and receive a copy of the Provider Agreement, after which they were certainly capable of ascertaining its terms.

The Court's finding is also informed by each parties' conduct post-contract formation. If Crutcher's own words did not evince an intent to join the contract before its formation, her actions afterward certainly did. After receiving a copy of the Provider Agreement in July 2009, Crutcher did not attempt to remove TLDI from the Agreement. It was not until 2014 that Crutcher sent a letter to Multiplan claiming there was no contract between TLDI and Multiplan. In light of the fact that both parties proceeded as if there were a provider agreement since 2008, and that Plaintiffs had a copy of the contract since 2009, the Court finds Plaintiffs' claim on this point unpersuasive. Ultimately, it is simply not plausible that in 2014 Plaintiffs actually believed that there was no contractual arrangement between TLDI and Multiplan, considering Crutcher specifically requested that TLDI be substituted for Branson Imaging in the Provider Agreement after receiving the Agreement, and furthermore acted for more than 6 years as if an Agreement existed. Because of the lack of a genuine issue of material fact on this point, the Court finds as a matter of law that a contract existed between TLDI and Multiplan. As a matter of equity, Plaintiffs accepted steerage under the contract and should not now be permitted to claim a right to recover for the discount which entitled them to that steerage.

13

### B. RICO Claims

Count I and Count II state claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO") pursuant to 18 U.S.C. § § 1962(c) and (d). Count I states a RICO violation under §1962(c) and Count II states a conspiracy to commit a RICO violation under §1962(d). Because the claims contain similar elements with a single exception, the Court will discuss them together.

Section 1962(c) makes it "unlawful for any . . . enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." To prevail in a RICO claim, Crutcher must establish that Multiplan engaged in conduct of an enterprise through a pattern of racketeering activity. *Crest Const. II v. Doe*, 660 F.3d 346, 356 (8th Cir. 2011). The gravamen of Crutcher's claim is that Multiplan repeatedly violated federal wire and mail fraud statutes by sending hundreds of wrongfully-discounted payments to TLDI between 2008 and 2016 and that this activity constituted a pattern of racketeering activity of the type that supports a RICO claim.

A RICO claim must be premised on the existence of certain predicate criminal acts. *Lange v. Hocker*, 940 F.2d 359, 362 (8th Cir. 1991). In this case, Crutcher asserts Multiplan committed wire fraud under 18 U.S.C. § 1343 and mail fraud under 18 U.S.C. § 1341. The elements of these crimes are as follows: (1) a plan to scheme or defraud; (2) intent to defraud; (3) reasonable foreseeability that mail [or wire] will be used in furtherance of the scheme; and (4) actual use of the mail (or wires) to further the fraudulent scheme. *United States v. Frank*, 354 F.3d 910, 916-918 (8th Cir. 2004) (citing *United States v. Bearden*, 265 F.3d 732, 736 (8th Cir. 2001). Additionally, in the RICO context, the plaintiff must allege the time, place, and content of all false

representations—it cannot rest on vague and conclusory allegations of fraud or misrepresentation. *Lange*, 940 F.2d at 362 (internal citations omitted).

Turning to the pleadings, Plaintiffs allege at several points instances where Multiplan made material omissions and misrepresentations. In paragraph 74 of their Complaint, Plaintiffs state "For example, MULTIPLAN and PHCS illegally applied unauthorized discounts to, and/or repriced, medical claims submitted by CRUTCHER/TRI-LAKES to insurance payers. MULTIPLAN and PHCS also represented in correspondence that there was a valid contractual agreement between MULTIPLAN/PHCS and CRUTCHER/TRI-LAKES which included discounts for medical claims submitted by CRUTCHER/TRI-LAKES despite the fact there was no validly executed contract agreement between MULTIPLAN/PHCS and CRUTCHER/TRI-LAKES."

Plaintiffs allege another instance of fraud in paragraph 76 of their Complaint, where she states that Multiplan made material misrepresentations regarding its downstream entities such as Coventry and CoxHealth on the EOB forms sent to Plaintiffs, which contained unauthorized discounts for payors that they had no right to apply.

Finally, Plaintiffs in paragraph 77 of their Complaint allegee that Multiplan committed fraud (1) when it sent improperly-discounted EOBs to Plaintiffs in connection to medical claims; (2) when it sent notices to third-party payors representing it was authorized to sell discounts for claims sent to TLDI; (3) when it sent letters to Plaintiffs regarding their status in the PPO network; and (4) when it sent payments to payors.

After careful review of the record, the Court finds there is no genuine issue of material fact as to whether there exist predicate acts capable of supporting a RICO claim. Plaintiffs' claims of fraud break down into two discrete accusations. First, Plaintiffs allege that Multiplan lied to

Crutcher about the existence of a PPO contract with TLDI so that it could improperly discount payments made to TLDI. For the reasons explained above, the Court has already found that there was a valid contract between TLDI and Multiplan. For this reason, these representations of the existence of a contract cannot be considered fraud.

The second accusation is that Multiplan lied to Plaintiffs and payors about the availability of contractual discounts to the downstream payors under the Network Agreement, again so that it could improperly discount payments made to TLDI. For the reasons explained below, the Court agrees with Plaintiffs that Multiplan violated the contract terms by allowing payors without payor agreements to access the discount. However, a breach of a contract does not, in and of itself, constitute evidence of fraud. A fraud claim requires a showing of both a plan and an intent to defraud. *Lally*, 863 F.2d at 613. The evidence pointed to by Plaintiffs in support of their RICO claim presents a compelling argument that Multiplan, at various points, breached its contract with TLDI. However, what Plaintiffs cannot point to is evidence of intentional wrongdoing necessary to conclude that these breaches were the result of a scheme or plan to defraud, as opposed to carelessness or a simple misunderstanding of the contract terms. In this case, although Multiplan breached the contract, the Court finds no evidence this breach was intentional or the result of a scheme or plan to defraud TLDI.

In the Court's view, the evidence does not show malice on the part of Multiplan but instead carelessness in both its treatment of TLDI and its understanding of the Network Agreement, likely a result of the fact that the relationship between the two entities was created almost accidentally, in the aftermath of multiple mergers and acquisitions. Furthermore, to the extent the material misrepresentations relied on by TLDI are contained in the EOBs, the Court notes these EOBs were created by the payors, not Multiplan, and as such cannot be considered misrepresentations made

16

by Multiplan itself. Because the Court finds no genuine issue of material fact as to whether Plaintiffs can satisfy that intentionality element of mail and wire fraud, it finds that no predicate acts exist that can support a RICO claim under § 1962(c) or a RICO conspiracy claim under § 1962(d). As such, the Court will grant Multiplan's Motion for Summary Judgment dismissing Counts I and II and deny Plaintiffs' Motion for Summary Judgment on these counts.

The Court separately notes that a RICO action requires the existence of an "enterprise," defined as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." *Craig v. Outdoor Advertising, Inc. v. Viacom Outdoor, Inc.*, 528 F.3d 1001, 1026 (8th Cir. 2008); 18 U.S.C. § 1961(4). An association-in-fact enterprise must have (1) a common or shared purpose; (2) some continuity of structure and personnel; and (3) an ascertainable structure distinct from that inherent in a pattern of racketeering. *McDonough v. Nat'l Home Ins. Co.*, 108 F.3d 174, 177 (8th Cir. 1997).

In this case, Plaintiffs claim there was an association-in-fact entity composed of Multiplan, PHCS, and the payors and insurance brokers who applied untheorized discounts to their TLDI invoices. They describe these entities as sharing a common purpose of arranging for the underpayment of TLDI bills, that they share a continuity of structure and personnel embedded by their contractual and business relationship, and that this structure is distinct from that inherent in a pattern of racketeering because it would exist independently of its scheme to defraud TLDI.

On its own review of the evidence, the Court finds no genuine issue of material fact as to whether there is a common purpose or continuity of structure or personnel. The Court is not aware of any case law indicating that the mere existence of a business relationship is enough to create a "continuity and structure of personnel" between Multiplan and the third-party payors and insurance brokers necessary to support this element of a RICO claim. Furthermore, as the Court

17

has already noted, there is no evidence that the payors and insurance brokers intentionally sought to deny TLDI the compensation it was entitled to via the application of unauthorized discounts. As such, it cannot be maintained that these third-party payors shared a common purpose with Multiplan. The Court finds there was no "enterprise" sufficient to support Plaintiffs' RICO claim and on this basis grants Defendant's Motion for Summary Judgment on Counts I and II.

### III. Unjust Enrichment

Plaintiffs state an unjust enrichment claim against Multiplan. In Missouri, unjust enrichment has three elements: (1) a benefit conferred by a plaintiff on a defendant; (2) the defendant's appreciation of the fact of the benefit; and (3) the acceptance and retention of the benefit by the defendant under circumstances in which retention without payment would be inequitable. *Hertz Corp. v. RAKS Hospitality, Inc.*, 196 S.W.3d 536, 543 (Mo. Ct. App. 2006). Plaintiffs claim that Multiplan benefitted from its silent PPO scheme by receiving kickbacks from payors and insurance brokers in exchange for allowing them access to the discount rate, that Multiplan knew of and appreciated these benefits, some percentage of which were in fact owed to TLDI, and that it would be inequitable to retain these benefits, which came at the expense of TLDI and Crutcher.

It is well-settled in Missouri that "If the plaintiff has entered into an express contract for the very subject matter for which he seeks recovery, unjust enrichment does not apply, for the plaintiff's rights are limited to the express terms of the contract." *Howard v. Turnbull*, 316 S.W.3d 431, 436-37 (Mo. Ct. App. 2010) (quoting *Farmers New World Life Ins. Co. v. Jolley*, 747 S.W.2d 704, 707–08 (Mo. Ct. App.1988). It has been established that there was a contract between Multiplan and TLDI. The Court finds the subject matter of this contract—specifically, TLDI's membership in Multiplan's PPO network and the availability of the discount rate to payors also in

18

that network—is precisely the subject matter for which Plaintiffs now seek recovery in her unjust enrichment claim. As such, the Court finds Plaintiffs' unjust enrichment claim is barred as a matter of law. For this reason, the Court will grant Defendant's Motion for Summary Judgment on Count III of Plaintiffs' Complaint.

### IV. Civil Conspiracy

Plaintiffs state a civil conspiracy claim against Multiplan. There are five elements to a civil conspiracy claim in Missouri: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful acts; and, (5) damages. *Lyn–Flex West, Inc. v. Dieckhaus*, 24 S.W.3d 693, 700 (Mo. App. E.D. 1999). Because Multiplan is the parent company PHCS, they may not conspire with each other. *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771 (1984). As such, any conspiracy would have to exist between Multiplan and the third-party payors and insurance brokers. Crutcher claims that the record establishes Multiplan and the third-party payors conspired to lease discount rates to downstream fourth-party payors, thereby intentionally breaching the Provider Agreement contract, and that this is sufficient to support a civil conspiracy claim.

The Court notes that although Multiplan might have breached the Provider Agreement when it allowed third-party payors to lease the discount rates to downstream payors, the third-party payors themselves were not party to the Provider Agreement. Rather, they were party to the Network Agreement, which by it terms allowed them to provide the discount rates to downstream payors. As the Court has already noted, there is no evidence in the record that the third-party payors knew that Multiplan was breaching the terms of the Provider Agreement or was part of any scheme to defraud TLDI by applying untheorized discounts. As such, it cannot be stated that there was a true "meeting of minds" between Multiplan and any of the third-party payors. Because there is no

19

genuine issue of material fact as to whether any third-party payors were aware of Multiplan's breach of the Provider Agreement or that the discounts they requested from TLDI were unauthorized, the Court will grant Defendant's Motion for Summary Judgment as to Count IV of Plaintiffs' Complaint.

### V. Fraud

Crutcher states a claim for fraudulent misrepresentation under Missouri law. There are nine elements to such a claim: (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) the speaker's intent that it should be acted on by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of the falsity of the representation; (7) the hearer's reliance on the representation being true; (8) the hearer's right to rely thereon; and (9) the hearer's consequent and proximately caused injury." *Hess v. Chase Manhattan Bank, USA, N.A.*, 220 S.W.3d 758, 765 (Mo. 2007) (en banc) (internal citations omitted). Plaintiffs, in their complaint, cites to three misrepresentations to support her fraud claim.

First, Plaintiff's point to an alleged misrepresentation made in a letter from Multiplan in July 2009. In a July 22, 2009 letter, Multiplan stated to Crutcher in response to a request for a copy of the Provider Agreement that it was "unable to locate the . . . facility contract" and that it was "probable [Crutcher would] need an updated contract for your ancillary facility." Crutcher claims that Multiplan in this letter represented its belief that there was no PPO agreement between Multiplan and TLDI and that Multiplan did not intend to apply the discounts to in-network payors, and that these representations were false. After review of the record, the Court finds there were no misrepresentations contained in its July 22 letter. Multiplan's representation that it could not locate the Provider Agreement is not the same as representing there was no agreement. The Court is also attentive to the fact that one week after sending its July 22 letter, Multiplan located the Provider

Agreement and promptly sent it to Crutcher. This is conclusive evidence that Multiplan believed that TLDI was a member of its PPO network throughout their dealings and that Multiplan did not falsely represent itself on July 22, 2009.

Second, Plaintiff's argue that Multiplan failed to disclose to Plaintiffs that it intended to and did lease PPO discounts to downstream payors. A failure to disclose information can constitute a misrepresentation for purposes of a fraudulent misrepresentation claim. *Id.* (citations omitted). In this case, Plaintiffs accuse Multiplan of intentionally failing to inform her that it would allow downstream payors to use its discounts, and that it misidentified, misrepresented, or omitted data on EOB forms sent to Crutcher in order to conceal the fact that downstream payors were taking advantage of its discounts. The Court has carefully reviewed these EOBs and finds they were created not by Multiplan but by third- or fourth-party payors, and were mailed directly from these payors to TLDI. Because Multiplan did not create these documents or transit them to TLDI, the statements in those documents cannot be considered representations made by Multiplan for purpose of this fraud claim. There is no evidence Multiplan arranged for or controlled the information downstream payors provided to Plaintiffs in their EOBs.

Finally, Plaintiffs argue that Multiplan fraudulently misrepresented itself in a letter sent to her on September 14, 2015, wherein it stated it would remove TLDI from its PPO network and cease applying discounts to invoices from payors, effective September 8. Plaintiffs point to 23 EOB forms sent to Plaintiffs by payors after September 8 and until May 2016 that contained an in-network discount as evidence that Multiplan's statement on September 14 was a knowing and intentional misrepresentation. After review of the record, the Court agrees with Plaintiffs that payors continued to apply in-network PPO discounts to its EOBs for more than eight months after Multiplan's letter. However, the Court also observes that these EOBs were created and sent to

21

TLDI by these payors, not by Multiplan itself. There is no evidence in the record that Multiplan was aware that these payors were continuing to apply unauthorized discounts to their TLDI invoices. As best the Court can discern from the record, the fault for these unauthorized discounts appears to fall squarely on the payors, who did not promptly pay heed to the disenrollment of TLDI from Multiplan's PPO network. As such, the Court finds that Multiplan's September 14, 2015 letter does not contain any knowing or intentional misrepresentations.

Because there is no genuine issue of material fact as to whether Multiplan knowingly and intentionally misrepresented itself in its 2009 letter, its 2015 letter, or in the EOBs sent by other organizations to TLDI, the Court will grant Multiplan's Summary Judgment on Count V of Plaintiffs' Complaint.

### VI. Accounting and Disgorgement

Plaintiffs state in their Suggestions in Opposition to Defendant's Motion for Summary Judgment that they are withdrawing their Accounting and Disgorgement claim. As such, the Court will grant Multiplan's Summary Judgment on Count VI of Plaintiffs' Complaint.

### VII. Breach of Contract

Plaintiffs assert in the alternative that if a contract existed, Multiplan breached the terms of the Provider Agreement in three ways: (1) By amending the contract without TLDI's written consent to increase the discount rate; (2) by allowing payors who lacked a direct contractual relationship with Multiplan to access to the discount rate; and (3) by failing to make best efforts to steer payors toward TLDI. The Court will address these alleged breaches in turn.

In Missouri a breach of contract claim has four elements: (1) the existence of a valid contract; (2) the rights and obligations of each party; (3) a breach; and (4) damages." *Kieffer v. Icaza*, 376 S.W.3d 653, 657 (Mo. 2012) (en banc). For purposes of this claim, both sides agree that

22

the Provider Agreement between TLDI and UP&UP (later acquired by Multiplan) is a valid contract between the parties that sets out each sides' rights and obligations.

**A. Discount Rate Provision**

The Provider Agreement establishes that "For Services furnished to each Outpatient, the settlement will be: 75% for Services Rendered." This indicates that payors that were part of the Multiplan PPO network were entitled to invoice TLDI 75% of what they would normally invoice for services rendered to outpatients, the equivalent of a 25% discount. Plaintiffs claim, and Multiplan admits, that in many cases payors invoiced and received a discount greater than 25%.

Multiplan claims this was not a breach because the flat 25% discount rate contained in the Provider Agreement was modified on two occasions. The first occasion was in 2007, when Multiplan transitioned from a 75% "Percent of Change" method to a variable SSRIM fee schedule. Multiplan notified TLDT of that change by letter on August 1, 2007. The letter contained a written copy of the amendment and the new fee schedule. TLDT did not respond to the letter but continued to operate and accept discounts under the new fee schedule. The second occasion was in November 2014, when Multiplan transitioned from the SSRIM fee schedule to the SRAD90 fee schedule. As in 2007, Multiplan notified TLDI of the change in a letter that contained a written copy of the amendment and the new fee schedule.

The Provider Agreement further states that "All amendments or modifications to this Agreement shall be mutually agreed to in writing by Provider and UP&UP." Plaintiffs claim that Multiplan's letters to TLDI did not effect an amendment of the contract because they were not "mutually agreed to in writing" by both TLDI and Multiplan. It is undisputed that TLDI never agreed to these amendments in writing. However, "even if a contract contains a clause saying that it can only be modified by a writing, nothing 'prevents the parties . . . from effecting modifications

23

by valid contractual formalities, even though there is no writing.'" *Prime Cut KC, LLC v. Kansas City Live Block 139 Retail, LLC*, 2015 WL 12731918, at *7 (Mo. Ct. App. Apr. 3, 2015) (quoting *Doss v. EPIC Healthcare Mgmt. Co.*, 901 S.W.2d 216, 221 (Mo. Ct. App. 1995)).

Multiplan tries to escape the plain language requiring mutual agreement to any amendments in writing in three ways. First, it claims that Plaintiffs suggest that any amendment to the Provider Agreement must be *signed in writing* by both parties, which the text of the contract does not require. But nowhere do Plaintiffs actually make this argument. Rather, Plaintiffs claim that for an amendment to occur, TLDI was required to agree to the amendment in writing, with or without a signature. This accords with the plain language of the contract.

Second, Multiplan claims that Plaintiffs assented to the SSRIM amendment in writing when they asked TLDI be substituted for TLDT in its directory in 2008, after the fee schedule changed from a flat fee to SSRIM. Again, the Court finds this argument unavailing. The plan language of the contract indicates that both sides must give written consent to any proposed amendment. Plaintiffs' request that TLDI be substituted for TLDT in the contract documents constitutes written consent that TLDI be substituted for TLDT in the contract documents—and no more. By its plain language, the 2008 letter from Crutcher to Multiplan did not constitute written consent to modify the fee schedule, as Multiplan claims.

Third, Multiplan claims Plaintiffs provided consent to the fee schedule amendments through their conduct, which effected a modification of the part of the contract requiring changes to be made in writing. Essentially, Multiplan argues that Plaintiffs waived two rights granted to them under the contract: (1) the right to have any amendment to the contract be agreed to in writing and (2) the right to receive 75% of the normal payment for business generated through the PPO network. Multiplan argues Plaintiffs waived these rights by not responding to its unilateral

24

amendment letters and by accepting payments from payors under the SSRIM fee schedule between 2007 and 2014 and under the SRAD90 fee schedule from 2014 to 2015. In Missouri, waiver of a contract provision is defined as the

> "intentional relinquishment of a known right, on the question of which intention of the party charged with waiver is controlling and, if not shown by express declarations but implied by conduct, there must be a clear, unequivocal, and decisive act of party showing such purpose, and so consistent with intention to waive that no other reasonable explanation is possible."

*Carroll's Warehouse Paint Stores, Inc. v. Rainbow Paint & Coatings, Inc.*, 824 S.W.2d at 151-52 (Mo. Ct. App. 1992) (internal citations omitted). In this case, the evidence of waiver is easy to spot: Plaintiffs' non-response to the unilateral amendments proposed by Multiplan and their practice of accepting discounted payments from payors under the new fee schedules for many years.

After careful review of the record, the Court finds Plaintiffs waived the amendment-in-writing requirement between August 2007 and November 2014 when, in 2008, Crutcher asked to substitute TLDT for Branson Imaging in the Multiplan network and continued to accept payments from payors at the new discounted rate without objection after receiving notice of the fee schedule modification. The only reasonable explanation of Plaintiffs' practice of accepting payments under the new fee schedule for almost six years is that they intended to waive agreement-in-writing requirement with regard to this modification and operate as if the SSRIM fee schedule had replaced the original. Crutcher's request to substitute TLDT for Branson Imaging came after this new fee schedule went into effect, strongly implying that Plaintiffs intended to abide by the SSRIM fee schedule then in existence.

In making this finding, the Court is cognizant of the clause in the Provider Agreement that states "Failure to exercise any right under this Agreement shall not act as a waiver of such right."

In *Robb v. Bond Purchase, LLC*, a Missouri court faced with a similar waiver clause and a similar argument that such language required the Court to disregard any conduct cited as evidence of waiver. 580 S.W.3d 70, 80 (Mo. Ct. App. 2019) ("No delay or omissions by Lender to exercise any right . . . under any other Loan Document shall impair such right . . . or be construed to be a waiver[.]". The court in that case rejected the proposition that such a clause could negate the parties' ability to modify their contract via later conduct or oral modification. *Id.* ("a provision that an express condition of a promise or promises in the contract cannot be eliminated by waiver, or by conduct constituting an estoppel, is wholly ineffective.") (quoting *Fritts v. Cloud Oak Flooring Co.*, 478 S.W.2d 8, 14 (Mo. Ct. App. 1972)). On its own review of the relevant Missouri case law, the Court finds strong support for the proposition that parties cannot rule out via waiver clause the possibility that they might in the future modify their contract via waiver based on implied conduct. See *Fritts*, 478 S.W.2d at 14; *Luck "E" Strike Corp. v. First State Bank of Purdy*, 75 S.W.3d 828, 830 (Mo. Ct. App. 2002); *Doss v. EPIC Healthcare Management Co.*, 901 S.W.2d 216, 221 (Mo. Ct. App. 1995). Because the contractual formalities of offer, acceptance, and consideration were adhered to as to the SSRIM fee schedule, the Court will deny Plaintiffs' Motion for Summary Judgment on this issue. Plaintiff accepted steerage between 2008 and 2014 after asking to be part of Multiplan's network and, after having every opportunity to express concern or object, accepted discounted payments not in the amount of 75% but in the amount dictated in the SSRIM fee schedule.

Multiplan sent Plaintiffs a new fee schedule, the SRAD90 fee schedule, in November 2014. Again, there is no evidence Plaintiffs agreed to this change in writing, as required by the contract. The Court finds no support in the case law for the proposition that Plaintiffs' decision to waive the amendment-in-writing requirement with regard to the SSRIM fee schedule nullified that

requirement for all time regarding future fee schedule changes. As such, the Court must conduct a separate waiver analysis for this separate proposed modification. Unlike the SSRIM fee schedule, the SRAD90 fee schedule was met with almost contemporaneous opposition from Plaintiffs. Specifically, Plaintiffs objected to the discounts applied under SRAD90 in the form of letters written to Multiplan and payors disputing their payment amounts and even the very existence of a Provider Agreement between them and Multiplan. These letters began on February 27, 2015, only months after SRAD90 went into effect. On the face of these almost-immediate objections, the Court finds no "clear, unequivocal, and decisive act" indicating a waiver of its right to agree in writing to this proposed modification. As such, the Court finds Multiplan, by applying the SRAD90 fee schedule without written consent from Plaintiffs, breached the terms of the Provider Agreement.

For the reasons explained above, the Court finds that Multiplan's proposed modification to the fee schedule modified the contract in the case of its SSRIM fee schedule but did not modify the contract in the case of its SRAD90 fee schedule. The Court does not consider there to be a genuine issue of material fact as to whether Multiplan breached the Provider Agreement by applying discounts under its SRAD90 fee schedule, which exceeded the discounts allowed under the SSRIM fee schedule. On this basis, the Court will grant Plaintiffs' Motion for Summary Judgment as to Count VII of the Second Amended Complaint with regard to its SRAD90 modification. The Court also finds that Multiplan breached the Provider Agreement by continuing to allow payors with active Network Agreements to make available to downstream entities the SRAD90 discounts after receiving notice from Plaintiffs on February 27, 2015, that it objected to that proposed modification to the Provider Agreement.

27

### B. Anti-Leasing Provision

Plaintiffs claim Multiplan breached the terms of the Provider Agreement when it made the discount rate available to payors who sold or leased Multiplan's list of providers to other payors or a broker. Plaintiff's also claim Multiplan breached the terms of the Provider Agreement when it made the discount rate available to payors who it did not have a direct contract with. The Court notes the waiver analysis conducted *supra* does not apply to this section because Plaintiffs were unaware that the downstream payors did not have active payor agreements with Multiplan.

The relevant provisions of the Provider Agreement state:

"UP&UP agrees not to offer discounted services to any Payor who sells or leases UP&UP's list of contracted Providers, either directly to other Payors or to a broker, who then sells the list to other Payors."

and

"Payor" means any self-insured employer, provider organization, health maintenance organization, financial institutions and associations, such as VISA and MASTERCARD, insurance company, third party· administrator, or any other entity and/or the clients of any of these entities which is responsible under Health Care Plan Benefits, liability claims, or Worker's Compensation benefits to pay Services for a Covered Person and has an active Payor Agreement with UP&UP."

and

"Payor Agreement" shall mean an agreement between payor and UP&UP providing access to UP&UP's Provider Network for Covered Person."

Multiplan admits that it provided access to its discount rate to providers who did not have an active Payor Agreement with UP&UP but claims this was allowed under the terms of the Provider Agreement.

On its own review of the contract terms, the Court disagrees. The contract's definition of "payor" is not a model of clarity, but it is unambiguous when closely parsed. It sets out two requirements of a payor: (1) that it be a self-insured employer, provider organization, health

maintenance organizations, financial institutions and associations . . . or any other entity and/or clients of any of these entities; *and* (2) that it have "*an active Payor Agreement with UP&UP*."

After careful analysis of both contracts, the Court observes that the Provider Agreement and the Network Agreements are conflicted on who is allowed to access the discount rate. Under the Provider Agreement, a "payor" is defined as any self-insured employer, provider organizations, insurance company, etc. that *has an active Payor Agreement* with Multiplan. A payor agreement means an agreement between that payor and Multiplan providing access to its network. Only payors, as defined in the provider agreement, are entitled to the discount rate under the provider agreement. The Provider Agreement also states that "UP&UP agrees not to offer discounted services to any Payor who sells or leases UP&UP's list of contracted Providers, either directly to other Payors or to a broker, who then sells the list to other Payors." The Network Agreement, on the other hand, envisions the discount rate being made available to downstream entities who have no contractual relationship with Multiplan. Multiplan, pursuant to its Network Agreement with Coventry and other directly-contracted clients, allowed payors with no direct contractual linkage to Multiplan to access the discounted rate when paying TLDI.

Multiplan argues that the downstream payors who accessed the discount rate did not need an active Payor Agreement with Multiplan because they were clients of organizations like Procura or Coventry, who did have active Network Agreements with Multiplan. As a matter of grammar, this argument fails. The plain language of the contract provision mandates that a payor "[have] an active Payor Agreement with [Multiplan]." This clause, which is a postpositive modifier attached to a straightforward, parallel construction that contains nouns and verbs in a series, is presumed to apply to the entire series. *See* Series-Qualifier Canon, BLACK'S LAW DICTIONARY 1574 (10th ed. 2014). The plain meaning of this clause of the Provider Agreement is that only entities with active

Network Agreements with Multiplan were allowed to access the discount rate. Because Multiplan has admitted it provided the discount rate to payors who themselves provided access to the discount rate to downstream entities who lacked Network Agreements with Multiplan, the Court does not consider there to be a genuine issue of material fact as to whether Multiplan breached the anti-leasing provisions of the Provider Agreement. For this reason, it will grant Plaintiffs' Motion for Summary Judgment as to Count VII of its Second Amended Complaint relating to discounts given to downstream payors who lacked active payor agreements with Multiplan and its predecessors.

### C. Payor Directory Provision

Plaintiffs argue Multiplan breached the Provider Agreement by failing to deliver via physical mail a "Payor Directory, with periodic updates, which shall acknowledge Payor's participation in Network." A Payor Directory is defined as "a listing of Payors having an active Payor Agreement with UP&UP." Multiplan concedes it never mailed such a directory to Plaintiffs, but states that it did transmit to Plaintiffs such a directory via Multiplan's website.

After careful review of the record, the Court finds that Multiplan did indeed make such a directory available to Plaintiffs via its website. Furthermore, the contract does not require the directory to be physically mailed to Plaintiffs. The directory need only be "delivered," and the Court finds that Multiplan, by making the directory available to Plaintiffs on an ongoing basis, accomplished delivery of the directory within the terms of the Provider Agreement. Because there is no genuine issue of material fact as to whether Multiplan satisfied this provision, the Court will grant Multiplan's Motion for Summary Judgment on this issue.

### D. Steerage Provision

Finally, Plaintiffs claim Multiplan breached the Provider Agreement by failing to steer payors toward TLDI. The relevant contract provisions states that "In consideration of Provider's

execution of this Agreement, UP&UP agrees to make best efforts that it shall contractually require each Payor which contracts with UP&UP to create financial incentives/benefits for Covered Persons to utilize Provider[.]"

Plaintiffs claim Multiplan did not make best efforts to contractually require payors to steer potential patients toward TLDI via financial incentives and benefits. Plaintiffs points to three examples to support their argument that Multiplan did not properly steer patients to TLDI.

First, Plaintiff's claim that none of TLDI's workers' compensation patients who accessed Multiplan's discounts were steered to TLDI by Multiplan because these workers were instead referred to TLDI by a physician, as required under Missouri's workers' compensation laws. Because these patients were steered to TLDI by their physician, and not by Multiplan, Plaintiffs claim Multiplan breached the steerage provision. After careful review of the record, the Court does not find this argument compelling. Under the Provider Agreement, Multiplan was only required to use best efforts to steer patients with access to the discount rate. It was categorically not required to steer every patient who had access to the discount rate. The fact that certain patients were referred to TLDI by physicians in accordance with Missouri's workers' compensation scheme does not indicate that Multiplan violated its steerage obligation.

Second, Plaintiff's claim that certain patients referred to TLDI by Cox HealthPlans were treated as in-network for purposes of applying discounts to the invoices sent by payors to TLDI but out-of-network for purposes of billing those payor's customers, resulting in a higher cost of care for those patients. Plaintiffs claims this violated the steerage provision because Multiplan failed to create financial benefits for these patients. After consideration of the entire record, the Court finds this argument fails. Even accepting that Cox overbilled certain patients who used TLDI's services for purposes of this analysis, it is still the case that Multiplan was only ever

31

required to use best efforts to create financial benefits to steer patients to TLDI. To that end, Multiplan's Network Agreement with Cox HealthPlans required Cox to steer patients toward TLDI. The Court notes that Multiplan steered hundreds of patients to TLDI over the years by providing financial incentives to use its services. Cox's failure to provide financial incentives to patients in certain limited instances does not fall on the shoulders of Multiplan, especially in lieu of evidence that Multiplan was aware of Cox's alleged billing practices in select cases.

Finally, Plaintiffs claim that Multiplan posted the incorrect phone number for TLDI on its website, instead posting the phone number for Raytel Imaging, thereby creating an "anti-steerage effect." The record shows that on September 5, 2014, Multiplan changed TLDI's phone number in its provider directory to a phone number belonging to Raytel Imaging. After careful review, the Court does not consider this isolated fact enough to support the proposition that Multiplan substantially breached its steerage obligations to TLDI. Based on the record, it appears far more likely that this switch in numbers was a simple clerical error. The Court additionally observes both that Plaintiffs did not alert Multiplan to this oddity and that it came near the end of their business relationship, by which point Multiplan had already steered a significant number of customers to TLDI.

None of the instances cited by Plaintiffs are sufficient for the Court to find that Multiplan failed to use its best efforts to obtain steerage. For the reasons explained above, the Court does not consider there to be a genuine issue of material fact as to whether Multiplan breached the steerage provision of the Provider Agreement. For this reason, the Court will grant Multiplan's Motion for Summary Judgment on this issue.

**VIII. Attorney's Fees**

The Provider Agreement states that "UP&UP shall indemnify and hold Provider harmless from loss [or] damage…(including reasonable attorneys' [] fees) arising from actual or alleged wrongful acts or omissions of UP&UP…in performing services contemplated under this Agreement." Plaintiffs assert that this language entitles her to collect attorney's fees for this litigation.

Usually, courts do not interpret indemnity clauses as permitting the recovery of attorney's fees in a suit between the two contracting parties for breach of contract. *Nusbaum v. City of Kansas City*, 100 S.W.3d 101, 109 (Mo. 2003) (en banc); *Monarch Fire Protection Dist. v. Freedom Consulting & Auditing Servs.*, 644 F.3d 633, 639 (8th Cir. 2011). In order to do so, the indemnity clause at issue must expressly refer to litigation between the parties as a reason to indemnify. *Monarch*, 644 F.3d at 637 (internal citations removed). In this case, the indemnification language refers only to "loss . . . arising from wrongful acts or omissions . . . in performing services contemplated under this Agreement." The Court finds no express reference in the indemnity clause covering litigation between the parties. For this reason, the Court will not impose attorney's fees on Defendants.

## CONCLUSION

For the reasons explained above, the Court hereby **GRANTS-IN-PART** and **DENIES-IN-PART** Defendants' Motions for Summary Judgment (Docs. 294 and 370) and **GRANTS-IN-PART and DENIES-IN-PART** Plaintiffs' Motions for Summary Judgment (Docs. 300 and 379). Defendants' Motions for Summary Judgment are granted as to Counts I, II, III, IV, V, and VI and denied as to Count VII of Plaintiffs' Second Amended Complaint. Plaintiffs' Motions for Summary Judgment are granted in part as described herein as to Count VII and otherwise denied. Counts I, II, III, IIII, V, and VI of Plaintiffs' Second Amended Complaint are hereby

**DISMISSED**. The Court hereby enters Judgment against Defendants in part as described herein on Count VII.

The Court believes that additional submissions are necessary to determine a sum-certain damage award on Plaintiffs' Breach of Contract claim. Plaintiffs are ordered to notify the Court of their precise requested damage award consistent with this Order together with supporting documentation by August 21, 2020 with suggestions in support. Defendants shall have 14 days to file suggestions in opposition to Plaintiffs' submission. Plaintiffs shall have 7 days from Defendants' filing weeks to file reply suggestions. Plaintiffs and Defendants have leave to submit these filings under seal.

If, after reviewing the submissions, the Court finds factual disputes requiring a jury determination, a trial will be scheduled. The Parties in their submissions should address whether a jury trial on damages is necessary or desired.

**IT IS SO ORDERED**.


DATED: August 4, 2020